Argued and submitted July 19, reversed and remanded November 8, 2006,
petition for review denied March 7, 2007 (342 Or 474)

STATE OF OREGON,
*Appellant,*

*v.*

DAVID P. ROEDER,
*Respondent.*

0410-53281; A128412

147 P3d 363

Laura S. Anderson, Assistant Attorney General, argued the cause for appellant. With her on the brief were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

William Uhle argued the cause and filed the brief for respondent.

Before Haselton, Presiding Judge, and Brewer, Chief Judge, and Wollheim, Judge.*

HASELTON, P. J.

---

\* Wollheim, J., *vice* Ceniceros, S. J.

**HASELTON, P. J.**

The state appeals from a pretrial order dismissing charges against defendant of driving under the influence of intoxicants (DUII), ORS 813.010, and reckless driving, ORS 811.140. *See* ORS 138.060(1) (state may appeal order dismissing accusatory instrument). The trial court granted defendant's motion to dismiss the charges on former jeopardy grounds because defendant previously had been acquitted of a violation concerning his refusal to take a breath test, ORS 813.095. On appeal, the state asserts that the trial court erred for either of two reasons: (1) the violation was not criminal in nature and, thus, did not trigger the protections of Article I, section 12, of the Oregon Constitution; or (2) the offenses were not required to be tried together because they did not constitute "the same offence" for purposes of that constitutional provision. As explained below, we agree with the state's first argument and, consequently, reverse and remand without reaching its second argument.

We present the basic background facts, which are not in dispute, as context for our analysis. On October 13, 2004, a police officer stopped defendant's car based on his suspicion that defendant was intoxicated. Two police officers had defendant perform field sobriety tests and, based on defendant's performance on those tests, took defendant into custody. When he arrived at the police station, defendant refused to take an Intoxilyzer test. One of the officers then issued defendant a citation for refusal to submit to a breath test. ORS 813.095.[1] About two weeks later, defendant was charged by information with misdemeanor DUII and with reckless driving. The citation for refusal to take a breath test and the DUII and reckless driving charges were not consolidated for trial. Instead, on January 14, 2005, defendant

---

[1] ORS 813.095 provides:

"(1) A person commits the offense of refusal to take a breath test if the person refuses to take a breath test when requested to do so in accordance with the provisions of ORS 813.100.

"(2) The offense described in this section, refusal to take a breath test, is a traffic offense punishable by a fine of at least $500 and not more than $1,000. The fine described in this section is in addition to any other consequence prescribed by law for refusal to take a breath test."

appeared in traffic court on the failure to submit to a breath test charge and, after a trial to the court, defendant was acquitted. Thereafter, defendant moved to dismiss the pending DUII and reckless driving charges based on the former jeopardy provision of Article I, section 12.[2] The trial court granted that motion and this appeal ensued.

██ The dispositive question is whether the proceeding on the charge of refusal to submit to a breath test, ORS 813.095, is the type of proceeding that implicates the former jeopardy provision of Article I, section 12. In making that determination, we apply the analysis described in *State v. Selness/Miller*, 334 Or 515, 54 P3d 1025 (2002). The threshold question is "whether the legislature intended to create a civil proceeding." *Id.* at 536. If so, then the question becomes whether, despite the legislature's intent, the ostensibly civil proceeding is, nonetheless, criminal in nature for purposes of Article I, section 12. *Id.* To make that determination, the court examines four factors:

"(1) [T]he use of pretrial procedures that are associated with the criminal law, such as indictment, arrest, and detention; (2) the potential for imposition of a penalty that is historically criminal or 'infamous,' or that cannot be justified fully in terms of the civil purposes that the penalty supposedly serves; (3) the potential for a judgment or penalty that carries public stigma; and (4) the potential for collateral consequences that, either taken by themselves or added to the direct consequences of the underlying forbidden acts, amount to criminal penalties."

*Id.*[3]

In *Selness/Miller*, the court considered whether charges concerning possession, manufacture, and delivery of a controlled substance were properly dismissed pursuant to Article I, section 12, because of a prior civil forfeiture proceeding that resulted in the forfeiture of the defendants' home in which they had approximately $60,000 in equity. *Id.*

---

[2] Article I, section 12, of the Oregon Constitution provides, in part, that "[n]o person shall be put in jeopardy twice for the same offence[.]"

[3] The court imported those factors from *Brown v. Multnomah County Dist. Ct.*, 280 Or 95, 570 P2d 52 (1977), which involved protections under Article I, section 11, of the Oregon Constitution.

at 518-19. As to the threshold question, the court noted that the legislature had clearly indicated that it intended such forfeiture to be "*civil* forfeiture," and that the remedy provided in the statute was "intended to be remedial and not punitive." *Id.* at 536 (emphasis in original). The court then turned to the four enumerated factors.

As to the first factor, "pretrial procedures," the court noted that the forfeiture laws did "not provide for the arrest and detention of property owners, or for any other procedure with similar criminal consequences for the property owners." *Id.* at 537. Regarding the second factor, the court simply noted that forfeiture of property was not an "infamous" penalty. *Id.* at 537-38. The court added that the amount of the penalty was not inconsistent with, or excessive in relation to, the remedial purposes of the law, "*e.g.,* to render drug manufacture and trafficking activities unprofitable by confiscating the proceeds, to render those activities more difficult by confiscating tools and other property that facilitate the activities, and to provide resources to governments that enforce drug trafficking laws." *Id.* at 538.

With respect to the third factor, "public stigma," the court concluded that, although "[t]here may be some vague public condemnation associated with the forfeiture of a home," that same "vague public condemnation" attends "foreclosures or proceedings to abate a nuisance," which "are indisputably civil." *Id.* at 539. Finally, as to collateral consequences, which the court identified as "forced relocation and economic devastation," the court described those as "peculiar to these defendants," noting that they had not participated in the forfeiture proceeding and thus had not requested a mitigation hearing. *Id.* In sum, the court found "nothing" in the forfeiture law that "negates the legislature's intent to provide a civil procedure and sanction." *Id.* at 540.

On the same day it decided *Selness/Miller*, the court also decided *State v. Lhasawa*, 334 Or 543, 55 P3d 477 (2002). In *Lhasawa*, the defendant argued that he could not be prosecuted for prostitution, a misdemeanor, because at the time of his arrest for that offense, he had been issued an exclusion order that excluded him for 90 days from the City of Portland's designated "prostitution-free zone" pursuant to

city ordinance. The defendant argued that prosecution for the misdemeanor was barred under the former jeopardy provision of Article I, section 12, because the exclusion had already put him in jeopardy for the same offense. *Id.* at 545.

The court applied the test that it had devised in *Selness/Miller*, beginning by noting that the city council, in enacting the prostitution-free zone (PFZ) ordinances, had intended to create a civil process and sanctions. *Lhasawa*, 334 Or at 550. The court then proceeded to the four-factor inquiry.

As to the first of the enumerated factors, concerning pretrial procedures associated with criminal law, the court observed:

> "One *amicus* suggests that the criminal nature of the PFZ exclusion process is demonstrated by the fact that, under the PFZ ordinance, arrest for one of the specified prostitution crimes is an essential precondition for issuance of an exclusion order. PCC § 14.150.030. However, although arrest is a necessary precondition to the exclusion process, that process is not part of the criminal prosecution that may follow from the arrest, but arises out of a separate source of law. Indeed, the police have no authority under the PFZ ordinance itself to arrest individuals for committing prostitution-related crimes. Thus, the fact that the individuals may be excluded from PFZs only after being arrested for a prostitution crime does not demonstrate that the PFZ exclusion process is criminal, rather than civil."

*Id.* (footnote omitted). With respect to the second factor, whether a "historically criminal" penalty was involved, the court rejected the argument that the 90-day exclusion was akin to banishment, which "traditionally meant exclusion from a sovereign's entire territory for life or a significant period of time." *Id.* at 551. Rather, the court concluded, the exclusion was more akin to "restraining orders and injunctions, which are imposed to maintain order within a designated geographical area or to protect specific persons from harassment or physical harm[,]" and that those types of orders were not historically considered criminal punishments. *Id.* The court further determined that the penalty was "justified in terms of [its] civil purpose." *Id.* at 554. In particular, the court rejected the defendant's proposition that a

sanction would need to be "narrowly tailored" to its remedial goal—and, instead, emphasized that the test is "less exacting," *viz.*, "whether the sanction is so excessive that it cannot be justified in terms of the civil purpose that it ostensibly serves." *Id.* at 554.

As to the third *Selness/Miller* factor, the potential for "public stigma," the court described an exclusion under the ordinance as "no more stigmatizing of the individual involved than domestic abuse restraining orders, ORS 107.718(1)(c), and other similar civil orders aimed at preventing violence and disorder, rather than at punishing past crimes." *Lhasawa*, 334 Or at 555. Finally, the court was unable to identify any collateral consequences resulting from the exclusion order. *Id.* at 556. The court thus concluded based on the totality of the *Selness/Miller* analysis that the prior exclusion was "not a criminal sanction" and consequently did not bar prosecution of the prostitution charge. *Lhasawa*, 334 Or at 556.[4]

We turn to the application of those principles to this case. The answer to the threshold "legislative intent" inquiry is clear. ORS 813.095 describes refusal to take a breath test as a "traffic offense" and specifies that the offense carries a fine of between $500 and $1,000. ORS 153.008(1)(b) provides that an offense is a violation if it "is punishable by a fine but [is not] punishable by a term of imprisonment." ORS 153.008(2) specifies that conviction of a violation "does not give rise to any disability or legal disadvantage based on conviction of a crime." Those statutes, understood together, demonstrate that the legislature did not intend refusal to take a breath test to be a criminal offense.

With respect to the first enumerated factor—*viz.*, the use of pretrial procedures associated with criminal prosecutions—this case is closely analogous to *Lhasawa*. The citation

---

[4] We have previously applied the *Selness/Miller* analysis in at least two instances. *See State v. Warner*, 200 Or App 65, 112 P3d 464 (2005), *rev allowed*, 340 Or 157 (2006) (careless driving, driving uninsured, and failure to carry proof of insurance violations did not bar subsequent prosecutions for DUII and reckless driving); *State v. Page*, 200 Or App 55, 113 P3d 447, *rev den*, 339 Or 450 (2005) (driving while suspended violation did not bar subsequent prosecution for DUII).

for refusal to take a breath test, like the issuance of an exclusion order in *Lhasawa*, is something for which an "arrest is a * * * precondition." 334 Or at 550. That is, a necessary prerequisite to the breath test is that the person asked to take the test has been "arrested for driving a motor vehicle while under the influence of intoxicants in violation of ORS 813.010 or of a municipal ordinance." ORS 813.100(1). However, the potential consequences that flow from the failure to take a breath test are qualitatively different, in substance and procedure, than those attending the arrest for DUII. Specifically, the arrest for DUII can (and in this case did) result in incarceration, followed by referral of the case to the district attorney's office for pursuit of criminal charges. Conversely, the issuance of a citation for refusing to take a breath test has different consequences that are prescribed by ORS 813.100(3)(a) to (d): The officer is to confiscate the person's driver's license, issue a notice of intent to suspend driving privileges, issue a temporary driving permit if the person meets certain criteria, and file a report with the Department of Transportation. In sum, a person is neither arrested nor incarcerated for refusal to take a breath test; rather, an administrative procedure is initiated to suspend the person's driving privileges.[5] We thus conclude that the procedures involved in a citation for refusing to take a breath test are not criminal procedures.[6]

We turn to the second factor, "the potential for imposition of a penalty that is historically criminal or 'infamous,' or that cannot be justified fully in terms of the civil purposes

---

[5] In that regard, the citation for refusing to take a breath test stands in the same relationship to the DUII arrest as the exclusion order did to the prostitution arrest in *Lhasawa*. The procedures and consequences attending the issuance of the exclusion order were that the exclusion would go into effect six days after the issuance of the order unless the recipient filed an appeal within five days of its issuance. If the recipient filed an appeal, "the City has the burden of showing by a preponderance of the evidence that the exclusion is based on conduct that constitutes a targeted prostitution-related crime. PCC § 14.150.160(1)." *Lhasawa*, 334 Or at 546 n 2.

[6] We recognize that, although the *procedures* involved are not criminal in nature, there is a significant connection between refusal of a breath test and a criminal prosecution for DUII: ORS 813.130(2)(b)(C) requires the police officer to explain to the arrested person the consequences of failure to take a breath test, including that the refusal may be offered in evidence in a DUII prosecution. That connection does not, however, substantively equate with criminal pretrial procedure.

that the penalty supposedly serves[.]" *Selness / Miller*, 334 Or at 536. That criterion is derived from *Brown v. Multnomah County Dist. Ct.*, 280 Or 95, 570 P2d 52 (1977). In *Brown*, the court noted that a fine of $1,000 for driving under the influence of intoxicants,[7] "if not in itself a criminal rather than civil penalty, must be at the margin of legislative discretion. At the least it is strong evidence of the punitive significance that the legislature meant to give this fine." *Id.* at 105.

Defendant argues that the fine in this case is, in fact, more significant than that found to be an indication that an offense was "criminal" in *Brown*, noting that, while the fine at issue there merely had a $1,000 maximum without any mandatory minimum, ORS 813.095(2) prescribes "a fine of *at least* $500 and not more than $1,000." (Emphasis added.) The state counters that $1,000 is not what it used to be—and that, as adjusted for inflation, $1,000 in 1977 is the equivalent of $2,250 today. Whatever the merits of the state's "present value" response,[8] we do not believe that the court in *Selness / Miller* purported to adopt any sort of maximum fine litmus test[9]—especially given that the forfeiture that it held to be noncriminal in that case involved property valued at over $60,000. 334 Or at 519. Rather, the court noted:

> "Depending on the circumstances, forfeiture of an entire house or any other property that is a subject of [the forfeiture law] may be justified fully in terms of the remedial purposes of removing the tools of a drug manufacturer's or trafficker's trade and of confiscating profits."

*Id.* at 538-39. Thus, the proper focus is not on the amount of the penalty involved, viewed as some abstract "absolute," but instead on the amount, viewed in relation to the remedial purposes of the statutory scheme.

---

[7] At that point in time, the legislature had designated a first-time offense for driving under the influence as a "traffic infraction." *Brown*, 280 Or at 97.

[8] Which has particular resonance with respect to candy bars, postage stamps, and baseball cards—not to mention the price of gasoline.

[9] In fact, it is quite debatable that the court in *Brown* intended any such thing either, given its recognition that any such exercise in line-drawing concerning amounts of fines could be neither "conclusive nor permanent." *Brown*, 280 Or at 104.

Here, the fine of between $500 and $1,000 for refusing to take a breath test may be used for "enforcement of laws concerning driving while under the influence of intoxicants." ORS 153.630(6). The enforcement of DUII laws is a complex matter, which includes training for, and administration of, field sobriety tests and breath tests. *See, e.g.,* ORS 801.272 (field sobriety tests); OAR 257-025-0012 (same); OAR 257-025-0020 (same); OAR 257-030-0070 (operation of Intoxilyzer machines).[10] Given those substantial expenses and the fact that the fine under ORS 813.095(2) can be imposed only in circumstances in which an officer has developed probable cause to arrest somebody for DUII and has, in fact, arrested that person, that sanction is not "so excessive that it cannot be justified in terms of the civil purpose that it ostensibly serves." *Lhasawa,* 334 Or at 554.

We proceed to the third factor, potential for public stigma. Defendant contends that, because the refusal to take a breath test always arises in the context of arrest for DUII, the violation necessarily carries the same stigma associated with the arrest—and, indeed, may well be exacerbated by a communal perception that someone who refuses to take an Intoxilyzer test does so because he or she "has something to hide." *Selness/Miller* and *Lhasawa* contradict that argument. In the former, the court found no significant stigma to the forfeiture of a home in conjunction with a prosecution for possession, manufacture, and delivery of drugs, *Selness/Miller,* 334 Or at 539, and in the latter, the court found no significant stigma from an exclusion order based on probable cause of engaging in prostitution. *Lhasawa,* 334 Or at 555. Given that treatment, we cannot say that a violation in connection with intoxication—or suspected intoxication—carries such a significant stigma as to convert a civil proceeding into a criminal one.

---

[10] In support of the enactment of these provisions, Oregon State Police (OSP) officials submitted testimony and exhibits indicating that the fines would provide much needed support for OSP's maintenance of breath testing instruments throughout the state, as well as technical and analytical assistance to local law enforcement by OSP's forensic unit. *See generally* Tape Recording, House Committee on Judiciary, HB 2900, Mar 31, 2003, Tape 111, Side B (statements of Chuck Hayes and Jeff Rost); House Committee on Judiciary, HB 2900, Mar 31, 2003, Ex I, J (same).

The final *Selness/Miller* factor is the "potential for collateral consequences" that, "either taken by themselves or added to the direct consequences of the underlying forbidden acts," amount to criminal penalties. *Selness/Miller*, 334 Or at 536. Here, defendant has identified no adverse collateral consequences that flow from a citation pursuant to ORS 813.095 beyond the fine itself. However, the "underlying forbidden act"—the refusal to take the breath test—does have a "direct consequence." Under ORS 813.100(3), the refusal *qua* refusal triggers the initiation of an administrative proceeding to suspend one's driving privileges for between one and three years. *See* ORS 813.420. In all events, a suspension of driving privileges in these circumstances is not the type of collateral consequence that would serve to transform the issuance of the citation into a criminal proceeding.[11] The purpose of a license suspension is remedial, *State v. Phillips*, 138 Or App 468, 474, 909 P2d 882 (1996), and may flow from a number of situations that may, or may not, implicate violation of criminal laws. *See, e.g.*, ORS 339.254 (suspension of driving privileges of student in conjunction with certain expulsions from school); ORS 809.310 (suspension of driving privileges for providing false information to certain officials); ORS 809.417 (suspension of driving privileges for failure to file accident report or driving uninsured); ORS 809.419 (suspension based on a mental or physical condition or impairment that affects the person's ability to safely operate a vehicle). Thus, the final *Selness/Miller* factor does not militate in favor of deeming the prior proceeding on the citation for violation of ORS 813.095 "criminal in nature" for purposes of Article I, section 12.

The trial court erred in dismissing the DUII and reckless driving charges on former jeopardy grounds.

Reversed and remanded.

---

[11] We have previously held that a license suspension itself does not implicate Article I, section 12, because it is not a prosecution for an offense. *Schreiber v. Motor Vehicles Division*, 104 Or App 656, 802 P2d 706 (1990), *rev den*, 311 Or 266 (1991).