Filed 12/29/14  P. v. Pavlic CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E059002 |
| v. | (Super.Ct.No. SWF1200790) |
| MICHAEL PAUL PAVLIC, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  Angel M. Bermudez, Judge.  Affirmed.

Kyle D. Smith, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, A. Natasha Cortina and Minh U. Le, Deputy Attorneys General, for Plaintiff and Respondent.

1

A jury found defendant and appellant, Michael Paul Pavlic guilty of domestic battery. (Pen. Code, § 243, subd. (e)(1).)[1] The trial court sentenced defendant to county jail for a term of 365 days, and imposed a 10-year protective order protecting the victim from defendant. (§ 136.2, subd. (i).) Defendant raises four issues on appeal. First, defendant contends the trial court erred in instructing the jury on the law of self-defense because the trial court failed to inform the jury about one's right to defend one's self from unlawful touching. Second, defendant contends the trial court erred by imposing the protective order because domestic battery is not a crime of domestic violence. Third, defendant contends the trial court failed to consider the proper factors when imposing the 10-year protective order. Fourth, defendant contends substantial evidence does not support the imposition of a 10-year protective order. We affirm the judgment.

## FACTUAL AND PROCEDURAL HISTORY

### A. PROSECUTION'S CASE

The victim is female and was 57 years old in June 2013, when defendant's trial took place. The victim is a musician. Defendant and the victim met in 2009, and their relationship became romantic. Defendant moved into the victim's home, in the Pinyon Pines area of Riverside County.

---

[1] All subsequent statutory references will be to the Penal Code unless otherwise indicated.

In the months prior to March 22, 2012 defendant verbally abused the victim and exhibited "bizarre behavior." On March 22, the victim and defendant ate breakfast, spoke to one another, and had a "fairly calm morning." The victim exited the house and went to her recording studio, which is on the same property as the house, but in a separate building. The victim stayed in the recording studio for approximately four or five hours.

The victim returned to the main house in the late afternoon. The victim wanted to speak to defendant about their relationship and "what was going on with him." The victim found defendant lying in bed, in their shared bedroom. The victim sat on the edge of the bed, and rubbed defendant's back, in order to comfort him. Defendant began crying uncontrollably. Defendant then stood up and turned on "really loud music."

Defendant picked the victim up from the bed, grabbing her upper body or shoulder area. Defendant threw the victim into the corner of the room. Defendant screamed that the victim "ruined his life," called her a "'whore'" and a "'slut,'" and said he "must like dirty girls." Defendant "slammed" the right side of the victim's head, over her eye, with an object. The object was a gray box, which appeared to be a piece of audio equipment. The victim was sitting upright on the floor when defendant struck her with the box. Defendant struck the victim's head two or three times with the box. The victim's "eyes were full of blood." Defendant grabbed other objects, such as bowls, from around the bedroom and threw them at the victim's face.

The victim did not move or say anything during the attack. The victim feared that any response on her part would make the situation more dangerous. The victim felt dizzy, as though she were losing consciousness. Defendant picked the victim up again, grabbing underneath her arms, and threw her toward the bedroom door. The victim's head struck the door. The victim lay by the door, and then "got up, and ran."

The victim ran out of the house to her car. The victim kept her keys and telephone in her car, because she felt she may "need to run" at some point, due to defendant's prior behavior. The victim drove to the highway, and then stopped because she could not see due to the blood in her eyes. The victim called 911. Paramedics transported the victim to a hospital. The victim suffered a cut above her right eyebrow and bruising and swelling around her eyes. The victim also suffered "injuries to [her] ribs, bruising and [a] contusion across [her] breast." The cut above the victim's eyebrow required stitches.

Riverside County Sheriff's Deputy Edwards (Edwards) met the victim at the hospital. Edwards found the victim to be groggy, e.g., speaking slowly and having a difficult time recalling things, which the victim said was due to being dizzy as a result of the attack. Edwards believed the victim's dizziness explanation was consistent with the victim's condition, and did not believe the victim was intoxicated.

The victim told Edwards that she had been speaking to defendant in the bedroom when "he suddenly became angry." Defendant grabbed the victim's hair and pulled her to the ground. Defendant struck the left side of the victim's face with his fist and struck the right side with a metal object. While the victim was on the ground, defendant

4

grabbed her hair, and pulled her into the hallway outside the bedroom door. At that point, the victim ran out of the house.

Edwards went to the victim's house to serve defendant with an emergency restraining order. Defendant was at the house. Edwards looked defendant over for injuries, but did not see any injuries on him. Edwards entered the house, and told defendant he was under arrest. When looking around the house, Edwards saw (1) a small drop of blood on a sheet in the victim's and defendant's bedroom; (2) blood on the bedroom carpet; and (3) blood on a DVD player. The blood appeared to be fresh.

Defendant told Edwards the blood on the DVD player was from an incident with his neighbor a week prior. Defendant said he and the victim had a verbal argument that evening (March 22); he initially said it was only verbal. Later, defendant said the victim was on the ground and he dragged her out of the bedroom by grabbing her underneath her armpits and pulling her backwards. Defendant did not explain why he dragged the victim out of the bedroom. Defendant did not say the victim was kicking him when he dragged her. Defendant said the victim must have accidentally received the cut above her eye when he dragged her out of the bedroom. Defendant told Edwards he was not injured. When the victim was brought into the home, she saw the bloody DVD player, pointed to it, and said to Edwards, "'That's what he hit me with.'"

B.    DEFENSE'S CASE

In this subsection, we present defendant's version of the events. Defendant and the victim lived together for approximately two years. They had a romantic relationship that was "quite blissful" for the first year, and then "progressively deteriorate[d]" during

5

the second year. Defendant believed the relationship problems were due to the victim suffering a mental illness, bipolar disorder in particular. Defendant did not verbally abuse the victim, but believed the victim found any unflattering comments about her to be verbal abuse. In the later portion of the relationship, defendant and the victim would have disagreements, which would ultimately result in "off the wall shouting matches." Defendant explained that any disagreement would "essentially become a battlefield." At times, the victim physically abused defendant.

On the morning of March 22, defendant and the victim drank brandy and smoked marijuana together, in order to calm their nerves so they could discuss their relationship issues without arguing. Around 11:00 a.m., the two reconciled and engaged in intercourse. Later in the day, around 7:00 p.m., defendant and the victim's conversation took on a negative tone.

Defendant and the victim moved into the bedroom. Defendant sat on the bed, while the victim sat on the floor. Defendant and the victim drank brandy, smoked marijuana, and talked. Eventually, defendant decided to sleep. The victim was talking to herself, and defendant wanted the bedroom to be quiet, so he asked the victim to leave the room. The victim refused to leave. The victim shook her head and continued talking to herself.

During prior incidents when the victim consumed alcohol and marijuana she became physically incapacitated. As a result, defendant tried to determine if the victim was not leaving the room due to being drunk, "stoned," or having a multiple sclerosis seizure. The victim was sitting on the floor, so defendant lifted her off the floor by

6

placing his hands underneath her armpits. As defendant lifted the victim, "she swung around and circled"; she "swung out of [defendant's] grasp and brought her legs over the corner of the bed." The victim's buttocks were on the floor, but her legs were against the bed and her feet were on the bed. Defendant thought the victim might kick his face. Defendant tried to stop the victim from potentially kicking his face by "placing [his] hand on her legs." After defendant touched the victim's legs, she began "to kick at [him]."

Based upon the kicking motion, defendant determined the victim was not physically incapacitated. Defendant used both of his hands to restrain the victim's legs. The victim continued trying to kick defendant. The victim was also flailing her arms toward defendant, so defendant tried to block her arms as well. Defendant tried to remove the victim from the bedroom. Defendant believed the only way to grab the victim was by her hair, so he grabbed her hair. Defendant felt that grabbing the victim's hair would distract her from trying to strike him. Defendant used his free hand to push the victim's legs toward the bedroom door.

Defendant believed the victim struck her head on a TiVo box, which was on the floor (it was not a DVD player). As defendant pushed the victim's legs toward the door, her torso "flopped on the ground," and that was perhaps the moment when her head struck the box. At that point, the victim was not trying to hit or kick defendant.

Defendant then placed both of his hands under the victim's armpits, from behind; placed his foot on the victim's buttocks; and pushed her toward the bedroom door. The victim was not hitting or kicking defendant, but her legs were moving "back at [him]."

7

After placing the victim outside the bedroom, he "slammed the door behind her." Defendant did not believe the victim would attack him once she was outside the room.

Defendant denied calling the victim a slut during the altercation, but did, during the altercation, say the victim "ruined [his] life." Defendant denied throwing the victim around the room, denied throwing objects at her, and denied striking her with a metal box. Defendant did not tell Edwards about the victim attempting to attack him because Edwards did not ask. Defendant told Edwards he thought the blood on the TiVo box was from an altercation with a neighbor because he previously had a physical altercation with his neighbor in the house, and defendant did not realize the victim had been injured during their altercation.

Approximately 10 days prior to the incident at issue in this case, the victim was violent with defendant. During the prior incident, the victim threw two, one-foot tall glass vases at defendant. The victim's ex-husband testified that they divorced in the fall of 2005. In September 2005, the victim grabbed her ex-husband and shoved him backward, causing him to fall.

During closing argument, defense counsel argued defendant "was being kicked and hit by [the victim], [and] did the only thing that he felt like he could do at that moment, and that was to defend himself." Defense counsel asserted the victim's testimony about the events was inconsistent with her prior statements about the incidents. Defense counsel argued that defendant's version of the incident was consistent with the evidence, such as the victim's injuries, and reflected the victim "was

struggling with him." Defense counsel asserted defendant was in imminent danger of being kicked in the face by the victim.

After the close of evidence, the trial court listed the jury instructions that would be given to the jury "after discussing [the instructions] with counsel." The trial court asked the attorneys if they wanted to put any arguments on the record. Both attorneys declined. The trial court told the attorneys to "go home and read" the instructions, and let the court know the following morning if there is "some issue with the instruction[s] or [if the court] made a typo or something like that." The reporter's transcript for the following day begins with the trial court reading instructions to the jury.

## DISCUSSION

### A.     JURY INSTRUCTION

#### 1.     *CALCRIM NO. 3470*

The trial court instructed the jury with CALCRIM No. 3470 as follows: "Self-defense is a defense to Penal Code Sections 273.5 and 243(e)(1). The defendant is not guilty of those crimes if he used force against the other person in lawful self-defense. The defendant acted in lawful self-defense if:

"1.  The defendant reasonably believed that he was in imminent danger of suffering bodily injury;

"2.  The defendant reasonably believed that the immediate use of force was necessary to defend against that danger;

"AND

9

"3. The defendant used no more force than was reasonably necessary to defend against that danger.

"Belief in future harm is not sufficient, no matter how great or how likely the harm is believed to be. The defendant must have believed there was imminent danger of bodily injury to himself. Defendant's belief must have been reasonable and he must have acted because of that belief. The defendant is only entitled to use that amount of force that a reasonable person would believe is necessary in the same situation. If the defendant used more force than was reasonable, the defendant did not act in lawful self-defense.

"When deciding whether the defendant's beliefs were reasonable, consider all the circumstances as they were known to and appeared to the defendant and consider what a reasonable person in a similar situation with similar knowledge would have believed. If the defendant's beliefs were reasonable, the danger does not need to have actually existed.

"If you find that [the victim] threatened or harmed the defendant or others in the past, you may consider that information in deciding whether the defendant's conduct and beliefs were reasonable.

"If you find that the defendant knew that [the victim] had threatened or harmed others in the past, you may consider that information in deciding whether the defendant's conduct and beliefs were reasonable.

"Someone who has been threatened or harmed by a person in the past is justified in acting more quickly or taking greater self-defense measures against that person.

"A defendant is not required to retreat.  He or she is entitled to stand his or her ground and defend himself or herself and, if reasonably necessary, to pursue an assailant until the danger of bodily injury has passed.  This is so even if safety could have been achieved by retreating.

"The People have the burden of proving beyond a reasonable doubt that the defendant did not act in lawful self-defense.  If the People have not met this burden, you must find the defendant not guilty."

2.    *ANALYSIS*

Defendant contends the trial court erred by failing to instruct the jury that defendant had the right to defend himself if he feared being touched unlawfully.

The instruction, in its unedited form, provides, "The defendant acted in lawful (self-defense/ [or] defense of another) if:

"1.  The defendant reasonably believed that (he/she/ [or] _____ *<insert name of third party>*) was in imminent danger of suffering bodily injury [or was in imminent danger of being touched unlawfully]."  (CALCRIM No. 3470.)

Defendant asserts the trial court erred by omitting the bracketed language regarding unlawful touch.  Defendant asserts the victim was unable to pose a risk of injury to defendant, and therefore, he could not reasonably fear bodily injury from the victim, and as a result his self-defense argument rested upon a theory that "[the victim] was touching [defendant] unlawfully."

"We review a claim of instructional error de novo.  [Citation.]"  (*People v. Fiore* (2014) 227 Cal.App.4th 1362, 1378.)  "A court must instruct sua sponte on general

11

principles of law that are closely and openly connected with the facts presented at trial. [Citation.]" (*People v. Ervin* (2000) 22 Cal.4th 48, 90.) However, a trial court's duty to instruct sua sponte "on particular defenses is more limited, arising 'only if it appears that the defendant is relying on such a defense, or if there is substantial evidence supportive of such a defense and the defense is not inconsistent with the defendant's theory of the case.' [Citations.]" (*People v. Barton* (1995) 12 Cal.4th 186, 195.)

"'[T]he least touching'" can constitute an unlawful touching. The touch "'need not be violent or severe, it need not cause bodily harm or even pain, and it need not leave a mark.' [Citation.]" (*People v. Shockley* (2013) 58 Cal.4th 400, 404-405.)

Defendant testified that he feared being kicked in the face by the victim. Defendant testified the victim moved her legs "in a threatening gesture, as if she [was] going to kick [him] in the face." Defendant said, "She began to kick at me after I grabbed her legs . . . ." Defendant testified, "I'm trying to restrain her legs which [she] is now active[l]y trying to kick me in the face with. But at the same time she is also trying to strike me." Defendant said, "I wasn't having to strike, but basically trying to block her blows." Defendant spoke about previously having his nose broken due to being kicked in the face. Defendant said he feared the victim would break his only pair of glasses. The victim testified that she did not react in any manner to defendant's attack.

The foregoing evidence reflects two versions of the incident at issue. First, in defendant's version, the victim repeatedly tried to kick defendant in the face. The victim also tried to strike defendant with her arms. Second, the victim did nothing—she

12

did not try to strike or kick defendant. Therefore, there was no evidence supporting the bracketed "unlawful touch" language. (CALCRIM No. 3470.) The proper instruction was given by the trial court, i.e., "imminent danger of suffering bodily injury." (CALCRIM No. 3470.) A kick in the face would not be the "least touching." Attempting to kick a person's face is violent and would likely result in bodily harm and/or pain. As defendant testified, it could result in a broken nose. Accordingly, we conclude the trial court properly instructed the jury with the "bodily injury" language.

Defendant contends the unlawful touch language was relevant to the evidence in the case because, at one point, defendant testified, "Well, at this point she's already trying to strike me, poorly, with her hand. And far more effectively, though I happen to be in control with her feet, which is far more damaging. And at the very least, I stand— again, I've had my nose broken before by getting kicked in the face. I've had basketballs and et cetera in my face, where I wear wire frames. I have 20/500 in both eyes. I was also trying to protect my glasses."

Defendant contends that because he said the victim was "poorly" trying to strike him with her hand that he only feared the least touching. Defendant fails to appreciate the rest of his testimony. Defendant was explaining that he was restraining the victim's feet because he feared being kicked in the face. Defendant was justifying his actions of restraining the victim's legs by explaining that he feared the greater damage she could inflict via kicking him, as opposed to hitting him. Thus, defendant was explaining his fear of suffering bodily injury, i.e., his fear of being kicked in the face. As a result, we are not persuaded that defendant only feared a slight touching from the victim's "poor"

13

arm strikes because the evidence reflects he feared being kicked in the face due to the potential for bodily injury, i.e., a broken nose.

Next, defendant contends that because the victim was drunk, high, and female, defendant would not have feared she could inflict bodily injury. Defendant is contradicting the theory of the case that he presented in the trial court. During closing argument, defendant's trial counsel argued, "Now, we know that [defendant] reasonably believed that there was imminent danger. [The victim] started kicking and hitting him near the face. She snapped and went crazy on him. That is imminent danger." Defendant's trial attorney further argued, "[Y]ou heard him tell you that if he didn't block those kicks and punches, he would have gotten kicked in the face." The instruction the trial court gave was responsive to the theory of the case defendant presented at trial, i.e. fear of bodily injury. Accordingly, we find defendant's argument to be unpersuasive.

Defendant contends that because *he* was charged with battery, which can be committed by the least touching, the self-defense instruction should have included the "unlawful touch" language, in regard to the victim's actions. Defendant does not provide an explanation for this reasoning. Defendant does not explain how the charges against *him* would require particular language regarding the *victim's* conduct. As explained *ante*, the evidence would not have supported a finding of defendant fearing the least touching from the victim, since the evidence reflected either no action on the victim's part or attempted kicks in the face.

Next, defendant asserts that all bodily injuries involve a harmful or offensive touching, therefore, the trial court should have included the "unlawful touch" language in the instruction. If an attempted kick in the face creates imminent danger of suffering bodily injury, then the instruction adequately addressed the law and evidence. The jury would not also need to be instructed on lesser touchings.

Lastly, defendant asserts the trial court gave the jury "two instructions" that lowered the prosecution's burden of proof. Defendant asserts the jury was instructed that the prosecutor only had to prove an unlawful touching for the battery charge, but defendant had to prove he feared suffering bodily injury, and therefore, the prosecutor's burden of proof was lowered. Defendant asserts he should have only been required to prove fear of an unlawful touching.

Defendant's argument is unpersuasive because he is not addressing the portion of the instruction concerning the burden of proof. The trial court properly instructed the jury, "The People have the burden of proving beyond a reasonable doubt that the defendant did not act in lawful self-defense. If the People have not met this burden, you must find the defendant not guilty." The trial court properly instructed the jury on the prosecution's burden of proof. (See *People v. Adrian* (1982) 135 Cal.App.3d 335, 339-341 [prosecution must disprove self-defense].) The trial court did not instruct the jury that defendant had to prove the element of fear. Accordingly, we find defendant's argument to be unpersuasive.

15

B.    PROTECTIVE ORDER

Defendant contends the trial court erred by imposing a 10-year protective order because domestic battery is not a crime of domestic violence.

We apply the de novo standard of review since we are interpreting the law. (*People v. Moncada* (2012) 210 Cal.App.4th 1124, 1129.)  Defendant was convicted of misdemeanor domestic battery.  (§ 243, subd. (e)(1).)  A battery may be accomplished by "'"'the least touching.'"'"  The touching does not need to be violent or severe. (*People v. Colantuono* (1994) 7 Cal.4th 206, 214, fn. 4.)

Under section 136.2, subdivision (i), a trial court may impose a protective order that is valid for a maximum of 10 years in cases in which a defendant has been "convicted of a crime of domestic violence as defined in Section 13700."  As relevant here, "'[d]omestic violence' means abuse" between cohabitants.  (§ 13700, subd. (b).) "'Abuse' means intentionally or recklessly causing or attempting to cause bodily injury, or placing another person in reasonable apprehension of imminent serious bodily injury to himself or herself, or another."  (§ 13700, subd. (a).)

Since a battery may be accomplished by "the least touching," it would not necessarily require bodily injury or fear of serious bodily injury.  (See *People v. Wilkinson* (2004) 33 Cal.4th 821, 839 [discussing battery with injury and battery without injury].)  As a result, defendant is correct that not every crime of domestic battery (§ 243, subd. (e)(1)) would satisfy the statutory definition of domestic violence (§ 13700, subds. (a)&(b)).

16

The People assert battery fits within the statutory definition of domestic violence because the definition includes "attempting to cause bodily injury." (§ 13700, subd. (a).) The People reason that if an attempted act is domestic violence, then a consummated act of battery would also be domestic violence. The People's reasoning is problematic because they are failing to address the "bodily injury" aspect of the definition. Since a battery can involve the "least touching," a battery does not necessarily include bodily injury. (See *People v. Wilkinson*, *supra*, 33 Cal.4th at p. 839 [discussing battery with injury and battery without injury].) Since the People do not resolve this problem, we find their reasoning to be unpersuasive.

Next, the People assert defendant's crime of battery falls within the statutory definition of domestic violence based upon the evidence presented in the case. Defendant responds, "If a jury did not decide [defendant's] guilt on the issue of whether this battery amounted to an abuse, he should not be sentenced as though he was found guilty of an abuse."

Defendant's argument relies on an assumption with which we disagree. Defendant, without explanation, discusses the protective order as though it is a form of punishment. The relevant general rule is: "Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." (*Apprendi v. New Jersey* (2000) 530 U.S. 466, 490.) The question we must address is whether the protective order is a "penalty."

17

There are two factors for determining whether an action constitutes a penalty: (1) "whether the Legislature *intended* the provision to constitute punishment and, if not, [(2)] whether the provision is [nonetheless] so *punitive in nature or effect* that it must be found to constitute punishment despite the Legislature's contrary intent.' [Citation.]" (*In re Alva* (2004) 33 Cal.4th 254, 270; see also *People v. Castellanos* (1999) 21 Cal.4th 785, 795 (*Castellanos*).)

The purpose of a protective order is not to punish the defendant; rather, the purpose is to protect the victim. (See *People v. Ponce* (2009) 173 Cal.App.4th 378, 383 [the purpose of protective orders issued during trial is to protect victims and witnesses].) The protective order statute reflects, "It is the intent of the Legislature in enacting this subdivision that the duration of any restraining order issued by the court be based upon the seriousness of the facts before the court, the probability of future violations, and the safety of the victim and his or her immediate family." (Former § 136.2, subd. (i).) The "probability" and "safety" language reflect the protective order is about preventing possible future harm. The seriousness of the current offense helps the court to determine the future risk to the victim. Accordingly, this statutory language reflects the Legislature's intent was to protect victims from a risk of harm, not to punish defendants.

Accordingly, we move to the next step of the analysis, which is whether the protective order is so punitive in nature or effect that it must be found to constitute punishment despite the Legislature's contrary intent. The protective order requires defendant to surrender any firearms, not contact the victim, not come within 100 yards of the victim, and not take any action to obtain the victim's address or location. We

analyze the protective order to sex offender registration requirements. Sex offender registration lasts for the offender's lifetime and requires providing law enforcement with one's address, photograph, and fingerprints. (*Castellanos*, *supra*, 21 Cal.4th at p. 790.)

Our Supreme Court has held sex offender registration "imposes a substantial burden on the convicted offender," but is not a punishment because the "burden is no more onerous than necessary to achieve the purpose of the statute." (*Castellanos*, *supra*, 21 Cal.4th at pp. 796, 799; see also *People v. Picklesimer* (2010) 48 Cal.4th 330, 343-344 [sex offender registration is not considered a form of punishment under the state or federal Constitutions].) Similar to sex offender registration, a protective order places a burden on a defendant. However, the burden is tailored to address the protective purpose. Defendant's movements and actions are restrained only in relation to the victim, so as to protect the victim. The surrendering of firearms is also for the sake of protecting the victim. Since the burden placed on defendant is no more onerous than necessary to achieve the purpose of protecting the victim, we conclude the protective order is not so punitive in nature or effect that it must be found to constitute punishment despite the Legislature's contrary intent. Accordingly, the protective order is not a "penalty."

Since the protective order is not a form of punishment, the trial court could make the abuse/bodily injury finding, rather than the jury. (*Apprendi v. New Jersey*, *supra*, 530 U.S. at p. 490 [a jury is required when the facts at issue increase the penalty for a crime].)

We now address the People's assertion that the evidence supports finding defendant's crime of battery falls within the statutory definition of domestic violence. Defendant was charged with inflicting injury, resulting in a traumatic condition, on a cohabitant. (§ 273.5, subd. (a).) A "'traumatic condition'" includes minor wounds. (§ 273.5, subd. (d).) The jury found defendant guilty of the lesser included offense of domestic battery. (§ 243, subd. (e)(1).) Since the jury rejected the injury/traumatic condition finding, the trial court could not contradict that finding in order to impose the protective order. In other words, the trial court could not impose the protective order because it found the victim suffered bodily injury. (See *People v. Siko* (1988) 45 Cal.3d 820, 823-826 [trial court cannot contradict a jury's findings when analyzing section 654 issue].)

However, the trial court could impose the protective order based upon a finding that defendant placed the victim "in reasonable apprehension of imminent serious bodily injury." (§ 13700, subd. (a).) The trial court did not make an explicit finding on the record regarding the charged conduct. However, the trial court did explicitly find risk of future harmful contact. The trial court said the parties' future contact could "lead to some sort of conflicts and hostilities, and I'm concerned about the safety of, actually, both parties." It can be inferred from this statement about future harm that the trial court impliedly found a risk of bodily injury in defendant's past conduct, because the trial court expressed concern for the parties' safety, which implies a risk of injury. Thus, we can infer the trial court found the victim feared imminent serious bodily injury due to defendant's charged conduct.

20

Based upon defendant's version of the events, he touched the victim first by trying to pick her up, he restrained her legs, grabbed her by her hair, placed his foot on her buttocks, and pushed her out of the bedroom. Given defendant's rendition of the events, the trial court could reasonably conclude the victim feared imminent serious bodily injury due to defendant picking up the victim, restraining the victim, and pushing her out of a room while she struggled against him.

Since (1) the trial court could impose the protective order based upon a finding that the victim was reasonably apprehensive of imminent serious bodily injury, (2) the evidence supports such a finding, and (3) such a finding can be inferred from the trial court's comments about future harm, we conclude the domestic violence protective order was properly imposed, even though domestic battery is not, in all cases, a crime of domestic violence.

### C. APPROPRIATE FACTORS

#### 1. *PROCEDURAL HISTORY*

At defendant's sentencing hearing, after pronouncing defendant's sentence, the trial court said it would consider the prosecution's request for a protective order. Defendant's trial attorney argued that a 10-year protective order was excessive, given defendant was convicted of a misdemeanor, and the order should be valid for only three years. The trial court said, "Well, I didn't hear anything on her part that she's seeking reconciliation. Are you aware of anything like that?" The prosecutor said, "No. My understanding is she wants no contact. She always has the right to come back in and

add this case on calendar, and I will have her do so if she request[s] a change." The trial court issued the 10-year protective order. (§ 136.2, subd. (i).)

After issuing the 10-year protective order, the trial court said, "In the event that I need to make findings under [section] 136.2 for concerning [*sic*] the continued conduct, I did watch the trial, I did see the testimony of the witness, and I did observe [defendant's] behavior. I would be concerned about repeated contact or by he against her. I think there's a possibility that they're going to have some further contact. It sounds like there's a quarter interest in property that the parties are going to need to resolve, which could itself lead to some sort of conflicts and hostilities, and I'm concerned about the safety of, actually, both parties."

### 2. Analysis

Defendant contends the trial court erred by failing to consider the proper factors when deciding the 10-year duration of the protective order.

Since we are considering whether the trial court used the proper legal factors, we apply the independent standard of review. (*In re Quoc Thai Pham* (2011) 195 Cal.App.4th 681, 685.) When a court is determining the duration of a protective order, the court must consider "[(1)] the seriousness of the facts before the court, [(2)] the probability of future violations, and [(3)] the safety of the victim and his or her immediate family." (§ 136.2, subd. (i)(1).)

We start at the end of the list with the third factor—safety. The trial court expressed concern about the safety of defendant and the victim, if they were to interact with one another in the future. Specifically, the trial court said, "I'm concerned about

22

the safety of, actually, both parties." Accordingly, we conclude the trial court considered the issue of the victim's safety.

The second factor is the probability of future violations. The trial court found there was a likelihood of "some further contact" due to defendant and the victim sharing property. The trial court believed the contact could lead "to some sort of conflicts and hostilities." The trial court's comments reflect a finding that there is a probability of future violations. In particular the trial court found a probability of issues arising during contact about shared property. As a result, we conclude the trial court properly considered the factor of likely future violations.

The first factor is the seriousness of the facts before the court. The trial court did not make an explicit finding regarding the seriousness of defendant's offense. However, the seriousness finding is implied in the trial court's comments regarding defendant's and the victim's future safety. The trial court said it was "concerned about the safety of, actually, both parties." The trial court's comment implies that defendant's past conduct was serious in that it presents a risk for future harm if it were to occur again. Accordingly, we conclude the trial court properly considered the seriousness factor.

Defendant contends the trial court did not consider the proper factors because, prior to issuing the protective order, the trial court was primarily concerned with whether the victim was trying to reconcile with defendant. We disagree that the trial court was concerned with reconciliation. The trial court expressly said it did not believe the victim was trying to reconcile with defendant. The trial court gave its findings

23

(those discussed *ante*) after issuing the protective order, so the process may have been somewhat backward in terms of announcing the findings; however, the trial court still made the appropriate findings.

D.    SUBSTANTIAL EVIDENCE

Defendant contends substantial evidence does not support the trial court's findings related to the duration of the protective order.

As set forth *ante*, the three factors for determining the duration of a protective order are "[(1)] the seriousness of the facts before the court, [(2)] the probability of future violations, and [(3)] the safety of the victim and his or her immediate family." (§ 136.2, subd. (i)(1).)  The maximum duration of a protective order is 10 years. (§ 136.2, subd. (i)(1).)  We will not disturb the protective order if there is substantial evidence supporting the trial court's findings.  (See *In re Cassandra B.* (2004) 125 Cal.App.4th 199, 210-211; see also *Bookout v. Nielsen* (2007) 155 Cal.App.4th 1131, 1137.)

In defendant's version of the events, he touched the victim first by trying to pick her up, he restrained her legs, grabbed her by her hair, placed his foot on her buttocks, and pushed her out of the bedroom.  The victim said she feared any response on her part would make the situation more dangerous.  The foregoing evidence supports the finding that defendant's offense was serious because it was not a simple touching, the victim was grabbed, pushed, and moved.  The situation could have easily escalated.  The risk of harm was great, especially given the different ways in which defendant handled the

24

victim—picking up, pushing, grabbing. The risk of harm was high, and therefore there is substantial support for the finding that the offense was serious.

The second element is the probability of future violations. The evidence reflects defendant and the victim lived together in the victim's house. After the offense at issue, defendant was still in the home; he was present when Edwards arrived. Also, defendant and the victim met one another online, through "mutual friends in the music community." Given the shared residence and friends, the trial court could reasonably conclude defendant and the victim would interact with one another in the future because their lives were intertwined. Additionally, since defendant claimed the victim was also violent, the trial court could reasonably conclude future meetings may be hostile, thus causing defendant to react violently. Accordingly, there is substantial evidence supporting the trial court's "future violations" finding.

The third element for the court to consider is the safety of the victim and her immediate family. As explained *ante*, there is potential for future harmful contact between defendant and the victim, due to their intertwined lives and bouts of hostility. Defendant asserts the victim is a violent person, and the victim asserts defendant is a violent person. Defendant testified the victim suffers from mental illness, and the victim testified that defendant displayed "increasingly bizarre behavior." Given the violent tendencies involved and other evidence just referred to, there is substantial evidence reflecting the victim's safety requires the imposition of a lengthy protective order.

In sum, substantial evidence supports the trial court's findings for the 10-year duration of the protective order. We conclude the trial court did not err.

## DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

MILLER _____
J.

We concur:

HOLLENHORST _____
Acting P. J.

KING _____
J.